UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON AT TACOMA

| | |
|---|---|
| AUTUMN BENNETT, SHANNAN HICKS, GENTIA JACKSON, KELLIE LEWIS, DEANNA MARCANTEL, RENEE MILLS, JODI RIDDLE, MILLIE STIVERS, and ANGELA WOLFE,<br><br>Plaintiffs,<br><br>v.<br><br>UNITED STATES OF AMERICA,<br><br>Defendant. | CASE NO. 3:17-cv-5774 RJB<br><br>ORDER ON UNITED STATES' RENEWED MOTION TO DISMISS |

This matter comes before the Court on the United States' Renewed Motion to Dismiss. Dkt. 35. The Court has considered the pleadings filed regarding the motion and remaining record, and is fully advised.

On September 27, 2017, Plaintiffs filed this case asserting negligence claims under the Federal Torts Claims Act, 28 U.S.C. § 2671 *et. seq*. ("FTCA") in connection with Darren Chotiner, M.D.'s alleged inappropriate contact with the Plaintiffs, who were female patients at the federally funded Peninsula Community Health Services clinics ("PCHS"). Dkt. 1. PCHS is

a health facility that receives federal support through the Federally Supported Health Centers Assistance Act ("FSHCAA"), 42 U.S.C. § 233. Under § 233, a lawsuit brought pursuant to the Federal Tort Claims Act ("FTCA"), 28 U.S.C. § 1346, *et. seq.*, is the exclusive remedy for personal injury "resulting from the performance of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigation" by an employee of the Public Health Service, or by parties "deemed" to be such employees, as are the PCHS employees here, and who are acting within the scope of their employment.

On May 31, 2018, the United States' motion to dismiss the Plaintiffs' claims for vicarious liability based on Dr. Chotiner's negligence, for lack of subject matter jurisdiction, was granted and those claims were dismissed. Dkt. 23. The United States' motion to dismiss Plaintiffs' claims for negligent supervision was denied, without prejudice. *Id.* The United States now renews its motion to dismiss the negligent supervision claims, pursuant to Fed. R. Civ. P. 12 (b)(1), arguing that this Court is divested of subject matter jurisdiction to consider Plaintiffs' claims because: (1) the claims do not fall within the limited waiver of sovereign immunity found in FSHCAA, 42 U.S.C. § 233, and (2) the discretionary function exception to the FTCA, 28 U.S.C. § 2680 (a), applies. Dkt. 35. For the reasons provided below, the motion (Dkt. 35) should be denied.

## I. FACTS AND PROCEDURAL HISTORY

### A. FACTS

According to the Complaint, the Defendant was aware that Dr. Chotiner engaged in inappropriate contact (passionate kissing with either a naked or gowned) female patient during an exam in October or November of 2011. Dkt. 1, at 4. He signed a "Performance Improvement Agreement," on November 16, 2011 which provided:

**Performance Improvement Agreement**

**Goal**: To meet Peninsula Community Health Services expectations for personal and patient boundaries.

"Providers shall interact and communicate with patients, families, legal guardians, and other visitors within a continuum of professional behavior, having boundaries that support patients and others with dignity and respect."

**Specific Actions Required**:

1. You will register and complete 'Professional Boundaries & Boundary Violations: A Primer', accessed through Professional Boundaries, Inc. This seminar will be completed prior to January 1, 2012.

2. You will voluntarily contact the Washington Physicians Health Program ("WPHP") prior to the end of November 2012. Through their services you will be assessed for any other counseling and will follow through on all recommendations. You will report back and provide documentation to Barbara P. Malich, CEO on your progress and completion of recommendations made by WPHP.

3. You will not provide primary care services to any female patients without a Medical Assistant in attendance. This does not apply to under aged females who are being attended by a parent or guardian during an exam. This will continue until Peninsula Community Health Services is satisfied that you will no longer demonstrate poor judgment when providing primary care to female patients.

**Positive Results**:

Should Darren Chotiner, MD meet the required expectations of his position as a Physician and comply with the specific actions listed above he will continue his employment with PCHS as a valued employee.

**Negative Results**:

Should Darren Chotiner, MD not meet the required expectations of his position as a Physician or fails to comply with the specific actions listed above, his employment will be terminated with one month additional pay.

*Id.*, at 5. The Complaint asserts that the Defendant failed to adequately investigate. *Id.*

According to the Defendant, after the Performance Improvement Agreement was signed, in December 2011, PCHS received notice that Dr. Chotiner had been evaluated by the WPHP,

and that it recommended that Dr. Chotiner self-report his boundary violation to the Washington Medical Quality Assurance Commission. Dkt. 36-6. WPHP confirmed that Dr. Chotiner did self-report the kissing incident. *Id.* Dr. Chotiner completed the professional boundaries course in December. Dkt. 36-7.

Washington's Medical Quality Assurance Commission initiated an investigation (Dkt. 36-8) which eventually culminated in it and Dr. Chotiner entering a Stipulation of Informal Disposition under which he was required to undergo additional training and pay a fine (Dkt. 36-9). On December 2012, the Medical Quality Assurance Commission notified Dr. Chotiner that he had completed the terms of their agreement. Dkt. 36-10.

On March 13, 2013, Barbra Malich, CEO of PCHS notified Dr. Chotiner that he met all the requirements of the November 16, 2011 Performance Improvement Agreement. Dkt. 36-11. He was informed that "there are no longer parameters set for your attendance to patients." *Id.* From November 16, 2011 to March 13, 2013, PCHS had to allot extra staff to be present with Dr. Chotiner when he saw female patients. Dkt. 42-4, at 3-4. Based on what she hoped he learned from the experience and with the additional education that he received, Ms. Malich felt that by March of 2013, Dr. Chotiner would no longer "demonstrate poor judgment when providing primary care to female patients." Dkt. 42-4, at 9.

According to the Complaint, each of the Plaintiffs were Dr. Chotiner's female patients after March 2013. Dkt. 1. None of the patients were offered chaperones, and no chaperone was present for any of the visits. *Id.*

The following are facts taken from the May 31, 2018, Order on Motion to Dismiss (Dkt. 23, at 3-6) and are repeated here for ease of reference.

> According to the Complaint, in August 2014, Plaintiff Bennett was seen by Dr. Chotiner for knee pain, and alleges that:

Dr. Chotiner began massaging her knee, then moved up her thigh, ultimately pushing her skirt up around her waist and pulling her underwear aside to expose her buttocks and massage there. No chaperone was present or offered to Ms. Bennett. Ms. Bennett was not given privacy to undress or provided with a drape or gown. *Id.,* at 5.

Plaintiff Hicks went to PCHS in August of 2014 for a breast exam, and asserts that she was initially seen by a medical assistant who assured her a chaperone would be present during the exam with Dr. Chotiner, but none was provided. *Id.*, at 6. She alleges that Dr. Chotiner then entered the room by himself and began the exam. *Id.* While he began the exam with gloves, Plaintiff Hicks asserts that Dr. Chotiner "removed the gloves and continued touching her breasts . . . [and] palpated each breast for an extended period . . . in a manner inconsistent with a typical breast exam." *Id.*

Plaintiff Jackson saw Dr. Chotiner twice in August 2014 for pain in her low back and thighs. *Id.* She relates:

Dr. Chotiner massaged her left thigh over her jeans, then pulled her jeans down to just above her knees and massaged her left thigh and groin area. At a subsequent visit, Ms. Jackson reported back pain. Dr. Chotiner instructed her to lay prone on the exam table. He pulled her pants and underwear down away from her hips. She was startled and jumped to pull her pants up. At neither visit was a chaperone present or offered to Ms. Jackson. She was not given privacy to undress or provided with a gown or drape. Dr. Chotiner used his bare hands during the exam. *Id.*

Plaintiff Lewis was seen by Dr. Chotiner in September and October 2014 for pain in her chest, shoulders, neck, and low back. *Id.,* at 7. In the September visit, Plaintiff Lewis alleges that "Dr. Chotiner manipulated her breast through her shirt for 10-15 minutes," and commented on the size of her breasts. *Id.* During the October visit, she asserts that, while she was seated on the exam table, Dr. Chotiner "stood between her legs, leaned into her as if hugging her, and massaged her back, neck, and chest for several minutes." *Id.* He then had her bend over and touch her toes from a standing position, long enough for her to get dizzy, while he sat directly behind her. *Id.* She was not given privacy to undress or provided a drape or gown. *Id.* He used his bare hands. *Id.*

Plaintiff Marcantel was also Dr. Chotiner's patient. *Id.* She asserts that he had her undress and dress in front of him, conducted exams and massages, including of her lower back, hip, chest, and breast area with his bare hands, without a chaperone present and without offering one. *Id.* She asserts she was not offered a drape or gown, and at one point, believes that he ejaculated after rubbing against her. *Id.*

| 1  | Plaintiff Mills was also a patient of Dr. Chotiner at PCHS. *Id.,* at 8. She asserts that he "regularly used his bare hands during [trigger point] injections, massages and examinations, including breast examinations." *Id.* She alleges that, while she was partially undressed, without a chaperone present, Dr. Chotiner would touch her in a "suggestive manner," speak to her about his sex life, his marriage, and her sex life. *Id.* Plaintiff Mills asserts that "[o]n multiple occasions, Dr. Chotiner performed massage by pulling her to the end of the exam table, standing between her legs and pulling his body into hers while massaging her shoulders and/or back." *Id.* |

Plaintiff Mills was also a patient of Dr. Chotiner at PCHS. *Id.,* at 8. She asserts that he "regularly used his bare hands during [trigger point] injections, massages and examinations, including breast examinations." *Id.* She alleges that, while she was partially undressed, without a chaperone present, Dr. Chotiner would touch her in a "suggestive manner," speak to her about his sex life, his marriage, and her sex life. *Id.* Plaintiff Mills asserts that "[o]n multiple occasions, Dr. Chotiner performed massage by pulling her to the end of the exam table, standing between her legs and pulling his body into hers while massaging her shoulders and/or back." *Id.*

Plaintiff Riddle saw Dr. Chotiner multiple times, and alleges that he had her undress and dress in front of him, performed examinations, trigger point injections, and massage with her partially undressed and without a chaperone present. *Id.* She also maintains that he made suggestive comments to her. *Id.*

Plaintiff Stivers also saw Dr. Chotiner several times, and asserts that he had her undress and dress in front of him, conducted exams, procedures and massages while she was partially undressed and without a chaperone present. *Id.* She alleges that he touched her "inappropriately," and discussed sex, "even though that was not a topic she raised or wished to discuss with him." *Id.,* at 9.

Plaintiff Wolfe was also Dr. Chotiner's patient. *Id.* She was seen in October and November 2014 for low back pain. *Id.* She asserts without a chaperone being offered or being present, and without being given privacy to undress or dress, ungloved:

Dr. Chotiner had her bend over the exam table, approached her from behind, and pulled her pants midway down her buttocks and used his thumbs to massage her lower back. Subsequently, Dr. Chotiner had her lay supine on the exam table, had her remove her top, and with his right hand massaged Ms. Wolfe's upper chest and with his left massaged her stomach and hip. Ms. Wolfe asked him to stop, which he did, and she sat up, pulled up her pants, and put her top back on. Dr. Chotiner had her sit up on the exam table, spread her legs and positioned himself between them, laid her head on his shoulder, and massaged her neck and lower back. At the subsequent visit, Dr. Chotiner had her take off her top any lay supine on the exam table. He pulled her pants partially down and massaged her lower back and buttocks. He then had her turn over on her back and moved to the foot of the table, where he stood between her legs and massaged her inner thighs and pelvic region. Dr. Chotiner then had Ms. Wolfe move into a seated position on the exam table, stood between her legs, pressed his body to her and massaged her back and buttocks. *Id.*

Dkt. 23, at 3-6.

On January 18, 2015, criminal charges were filed against Dr. Chotiner in Kitsap County, Washington Superior Court based on his conduct with some of the Plaintiffs here and with some patients that did not join this lawsuit. *State v. Chotiner*, Kitsap County, Washington Superior Court case number 15-1-00160-2. On September 24, 2018, he pleaded guilty and was sentenced to jail time and supervised release. *Id.*

**B. PROCEDURAL HISTORY**

After the United States' initial motion to dismiss the negligent supervision claim was denied, without prejudice, the parties engaged in discovery. The discovery deadline is April 26, 2019, the dispositive motions deadline is May 9, 2019 and a bench trial is set to begin on July 29, 2019. Dkt. 34.

## II. DISCUSSION

**A. STANDARD ON MOTION TO DISMISS**

Under Fed. R. Civ. P. 12 (b)(1), a complaint must be dismissed if, considering the factual allegations in the light most favorable to the plaintiff, the action: (1) does not arise under the Constitution, laws, or treaties of the United States, or does not fall within one of the other enumerated categories of Article III, Section 2, of the Constitution; (2) is not a case or controversy within the meaning of the Constitution; or (3) is not one described by any jurisdictional statute. *Baker v. Carr*, 369 U.S. 186, 198 (1962); *D.G. Rung Indus., Inc. v. Tinnerman*, 626 F. Supp. 1062, 1063 (W.D. Wash. 1986); *see* 28 U.S.C. §§ 1331 (federal question jurisdiction) and 1346 (United States as a defendant). A federal court is presumed to lack subject matter jurisdiction until plaintiff establishes otherwise. *Kokkonen v. Guardian Life Ins. Co. of America*, 511 U.S. 375 (1994); *Stock West, Inc. v. Confederated Tribes*, 873 F.2d 1221, 1225 (9th Cir. 1989). Therefore, plaintiff bears the burden of proving the existence of

subject matter jurisdiction. *Stock West*, 873 F.2d at 1225; *Thornhill Publishing Co., Inc. v. Gen'l Tel & Elect. Corp.*, 594 F.2d 730, 733 (9th Cir. 1979).

The United States, as sovereign, is immune from suit unless it consents to be sued. *See United States v. Mitchell*, 445 U.S. 535, 538 (1980); *Cato v. United States*, 70 F.3d 1103, 1107 (9th Cir. 1995). If a claim does not fall squarely within the strict terms of a waiver of sovereign immunity, a district court is without subject matter jurisdiction. *See, e.g.*, *Mundy v. United States*, 983 F.2d 950, 952 (9th Cir. 1993).

**B. FSHCAA and CLAIMS OF NEGLIGENT SUPERVISION**

Under 42 U.S.C. § 233 (a), provides a limited waiver of sovereign immunity. It provides:

> The remedy against the United States provided by [the FTCA] . . . for damage for personal injury, including death, resulting from the performance of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigation, by any . . . employee of the Public Health Service while acting within the scope of his . . . employment, shall be exclusive of any other civil action or proceeding by reason of the same subject-matter against the . . . employee . . . whose act or omission gave rise to the claim.

Under certain circumstances, federally funded entities like PCHS are "deemed" to be a Public Health Service employee as are the entities' employees. 42 U.S.C. § 233 (g)-(h). The parties agree that PCHS and its employees were "deemed" to be Public Health Service employees for purposes of this case.

The United States moves to dismiss this case, arguing that it has not waived sovereign immunity for the claims of negligent supervision under § 233 (a)'s limited waiver. Dkt. 35. It argues that the supervision of doctors is not a "medical, surgical, or dental or related function" and so immunity has not been waived. *Id.*

The United States takes an overly restrictive view on the coverage of § 233 (a). It argues that under cannons of statutory interpretation, the general term "related function" should be

construed to only embrace subjects similar in nature to those enumerated by the specific terms that preceded it. That is, that "related functions" only include functions similar to the provision of "medical, surgical, or dental functions." The statutory language does not stop there, however. It fully provides that it covers the "performance of medical, surgical, dental, or related functions, including the conduct of clinical studies or investigation." The addition of the clause "including the conduct of clinical studies or investigation" expands the notion of what "related functions" includes – adding in activities that are not direct provision of medical services. These activities are tangential to direct health care services, but Congress expressly included them. The United States' argument, then, that Congress intended for § 233 to apply only to medical malpractice suits is unconvincing. "When Congress has sought to limit immunity to medical malpractice claims it has done so explicitly." *See Cuoco v. Moritsugu*, 222 F.3d 99, 108 (2d Cir. 2000)(holding that § 233(a) does not apply only to medical malpractice cases)(*citing* 38 U.S.C. § 7316(a)(1) (providing exclusive remedy "for damages for personal injury ... allegedly arising from malpractice or negligence of a medical care employee" of the Veterans Health Administration)).

Moreover, even accepting the more restrictive view on what "related functions" includes, PCHS's alleged failure to properly supervise a doctor who they knew had exercised poor judgement with female patients in the past is a "related function" to the provision of medical care for female patients for purposes of § 233. This case is similar to *Brignac v. U.S.,* 239 F.Supp.3d 1367 (N.D. Ga 2017). There, a rape victim sued a federally funded health clinic for negligent hiring and retention of a doctor the clinic knew had sexually assaulted other patients who were in a prison complex. The United States argued that Brignac's claims should be dismissed because they were not covered by §233 (a). In rejecting the United States' overly restrictive view of the

waiver of sovereign immunity contained in § 233 (a), the court noted that "to become a 'deemed' entity in the first place, Family Health Centers is required to show that it has 'reviewed and verified the professional credentials, references, claims history, fitness, professional review organization findings, and license status of its physicians and other licensed or certified health care practitioners.'" *Brignac*, at 1377 (*quoting* 42 U.S.C. § 233(h)). It held that "[s]ection 233(h) can be viewed as adding a required element to the provision of medical care by the clinic." *Id*. Accordingly, it found that § 233 (a) included a waiver of sovereign immunity for claims for negligent hiring and retention. Likewise, under the facts alleged here, the Plaintiffs' claims for negligent supervision are included in § 233 (a)'s waiver.

The United States argues that even if negligent supervision is included in the § 233 waiver, the case should be dismissed because the clinic's decision to lift the restrictions in the Performance Improvement Agreement were discretionary and so the discretionary function exception to the FTCA bars these claims.

### C. FTCA CLAIMS AND SUBJECT MATTER JURISDICTION

The FTCA, the statute upon which this case is brought, is a limited waiver of sovereign immunity. *See* 28 U.S.C. § 1346 (b). The FTCA is the exclusive remedy for state law torts committed by federal employees within the scope of their employment. 28 U.S.C. § 2679 (b)(1). Among the exceptions to the FTCA waiver of sovereign immunity is the "discretionary function exception." It excludes:

> Any [§ 1346] claim based upon an act or omission of an employee of the Government, exercising due care, in the execution of a statute or regulation, whether or not such statute or regulation be valid, or based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). "The discretionary function exception insulates certain governmental decision-making from judicial second guessing of legislative and administrative decisions grounded in social, economic, and political policy through the medium of an action in tort." *Myers v. U.S.*, 652 F.3d 1021, 1028 (9th Cir. 2011)(*internal citations omitted*). "The government bears the burden of proving that the discretionary function exception applies." *Id.* Additionally, "[t]he FTCA was created by Congress with the intent to compensate individuals harmed by government negligence, and as a remedial statute, it should be construed liberally, and its exceptions should be read narrowly." *Terbush v. United States*, 516 F.3d 1125, 1135 (9th Cir. 2008).

A two-step test is used to determine whether the discretionary function applies. *Terbush*, at 1129 (*citing Berkovitz v. United States*, 486 U.S. 531, 536–37 (1988)).

In the first step, the court determines "whether challenged actions involve an element of judgment or choice." *Id*. Under this step, the "nature of the conduct, rather than the status of the actor" is examined. *Id.* "The discretionary element is not met where 'a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow.'" *Id.,* (*quoting Berkovitz*, 486 U.S. at 536). The inquiry ends if there is such a statute or policy directing mandatory and specific action because there can be no element of discretion when an employee "has no rightful option but to adhere to the directive." *Id*.

The government has sufficiently shown that there was no policy in place that directed mandatory and specific action in regard to the supervision or investigation of Dr. Chotiner. The challenged action – the decision to lift the restrictions on his ability to see female patients without a chaperone, was discretionary. If the challenged actions do involve an element of

judgment or choice, then the court turns to the second step in the test in the discretionary function exception test. *Terbush*, at 1129.

The second step requires the court to decide "'whether that judgment is of the kind that the discretionary function exception was designed to shield,' namely, 'only governmental actions and decisions based on considerations of public policy.'" *Terbush*, at 1130 (*quoting Berkovitz*, at 536-37).

The United States argues that PCHS's decisions as to how to supervise and manage its employees implicate considerations of social and economic policy and are the type of choices and judgments Congress intends to shield from liability. It points out that it provides medical care to patients, regardless of their ability to pay. It asserts that it must weigh protecting patients with the costs of providing chaperones.

The PCHS's decision to lift the restrictions on Dr. Chotiner's access to female patients without a chaperone is not the exercise of the kind of judgment that the discretionary function exception was intended to shield. "The decision to adopt safety precautions may be based in policy considerations, but the implementation of those precautions is not.... [S]afety measures, once undertaken, cannot be shortchanged in the name of policy." *Whisnant v. United States*, 400 F.3d 1177, 1182 (9th Cir. 2005). Cost considerations alone are insufficient. *Id.* "Where the challenged governmental activity involves safety considerations under an established policy, rather than the balancing of competing policy considerations, the rationale for the exception falls away." *Summers v. United States*, 905 F.2d 1212, 1215 (9th Cir. 1990).

### III. ORDER

It is **ORDERED** that:

- The United States' Motion to Dismiss (Dkt. 35) **IS DENIED**.

The Clerk is directed to send uncertified copies of this Order to all counsel of record and to any party appearing *pro se* at said party's last known address.

Dated this 22nd day of March, 2019.

*Robert J. Bryan*

ROBERT J. BRYAN
United States District Judge